689 A.2d 283

**COMMONWEALTH of Pennsylvania**

v.

**Robert HOCKENBERRY, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 13, 1997.

Filed Jan. 31, 1997.

Robert Hockenberry, appellant, pro se.

Mary B. Seiverling, Deputy Attorney General, Harrisburg, George R. Kepple, District Attorney, Kittaning, for Commonwealth, appellee.

Before POPOVICH, SAYLOR and HESTER, JJ.

HESTER, Judge:

Robert Hockenberry appeals from the August 22, 1996 order denying his motion to modify or correct an illegal sentence. We affirm.

Due to a presentment issued by the Seventh Statewide Investigating Grand Jury, the Pennsylvania Attorney General filed a six-count criminal complaint against appellant on August 26, 1991. Appellant was charged with corrupt organiza-

tions, conspiracy to commit corrupt organizations, possession of a controlled substance, possession of a controlled substance with intent to deliver, delivery of a controlled substance, and conspiracy. In addition, appellant's wife was charged with conspiracy. Appellant, his wife, and Louis Shaffer, another co-conspirator, proceeded to a joint trial, which lasted eight days. Nine witnesses were called by the Commonwealth. Numerous telephone interceptions were played for the jury. That evidence was well-summarized by the trial court:

In July, 1989 agents of the Attorney General's Regional Narcotics Task Force used a confidential informant, Carla Bowser, to purchase drugs from one John Emil Cravener. Investigation disclosed that Cravener's source of supply was one William Todd North. Surveillance of North led the agents to conclude that North's source of supply was one Ivan Shankle who, with his wife, Dorothy, lived in the Rural Valley area of Armstrong County.

In November, 1989 North was arrested by Kittanning police on charges of possessing cocaine and marijuana. While in custody he was visited by two agents of the Attorney General's Task Force, Fred Neal and Jeff Rood, and was asked to cooperate in their drug investigation. North agreed to do so. At the time his exclusive source of supply was Ivan Shankle.

On November 9, 1989 North made a controlled purchase of one (1) oz. of cocaine from Dorothy Shankle paying her the sum of $1400.00. A second controlled purchase took place on December 13, 1989 from Ivan Shankle. This purchase consisted of one-half (1/2) oz. of cocaine for $700.00.

North testified that when he made the second controlled buy, Hockenberry and Shaffer were both at the Shankle house and that he discussed his recent arrest with Hockenberry, (Transcript of Trial, p. 80–81).

At about this time the Attorney General's Task Force secured the long distance phone records for the Shankle residence and applied for and received authority to install a pen register on the Shankle phone. The pen register

disclosed a large number of phone calls to the Hockenberry and Shaffer residences in New Bethlehem. The agents next applied to the Superior Court for authority to intercept the phone conversations on the Shankle telephone. Superior Court Judge Joseph Del Sole granted authority to intercept the phone conversations on the Shankle phone for a period of 30 days beginning on January 31, 1990. An extension of 30 days was later granted. The agents later secured permission from Judge Del Sole to intercept conversations on the Hockenberry phone as well.

By intercepting various phone conversations involving Ivan Shankle, Dorothy Shankle, Hockenberry, Shaffer and other individuals, the agents learned of an impending trip to New York by Ivan Shankle and some friends with money supplied by Hockenberry and Shaffer. The purpose of the trip was to purchase a kilogram of cocaine for $28,000. An attempt to follow Shankle to this purchase failed and the agents decided to confront Shankle and confiscate the money. This was done and Shankle turned the money over to the agents on March 7, 1990. Shankle was unaware at this time that his phone conversations were being intercepted. Shortly thereafter, Shankle gave agents Neal and Rood a statement detailing his involvement in the drug network. The agents wanted Shankle's cooperation in getting to Hockenberry. Shankle refused to further cooperate with the Commonwealth in its investigation.

In approximately March, 1991 Shankle changed his mind and agreed to cooperate. At that time he testified before an investigating grand jury sitting in Harrisburg. Plea bargains had been worked out between the Commonwealth and Ivan and Dorothy Shankle so that when the Shankles were indicted by the grand jury, they pleaded guilty and agreed to testify for the Commonwealth in the Hockenberry and Shaffer trials.

At trial Dorothy Shankle admitted helping her husband, Ivan, distribute drugs, (Transcript of Trial pp. 220, 229, 231). She indicated that Ivan received his drugs from Hockenberry and that she sometimes accompanied Ivan to

Hockenberry's house in New Bethlehem either to pick up drugs or to deliver money for drugs previously purchased, (Transcript of Trial p. 215). Dorothy testified that she frequently talked to Sherry Hockenberry on the phone setting up meetings with her husband and Sherry's husband, (Transcript of Trial pp. 215, 229). Dorothy further testified that Hockenberry and Shaffer delivered drugs to the Shankle house as well, (Transcript of Trial p. 218). The money for the drugs Ivan Shankle distributed was collected by Hockenberry and Shaffer either at the Shankle residence or the Hockenberry residence, (Transcript of Trial p. 219). Dorothy explained that Ivan received his drugs on a front meaning that he sold the drugs first and paid for them later, (Transcript of Trial p. 218). She testified that the money was paid to Hockenberry or Shaffer either by Ivan or by herself on Ivan's behalf, (Transcript of Trial p. 219). Although she dealt more often with Hockenberry, Ms. Shankle indicated that sometimes Shaffer came for money by himself, (*Id.*). Dorothy Shankle admitted being an active drug dealer in cocaine and marijuana between April, 1989 and March, 1990 selling drugs to numerous people who were named as co-conspirators. Dorothy testified she and Ivan ceased their drug dealing activities when Ivan Shankle was confronted by Neal and Rood in March, 1990 and the $28,000 was confiscated.

Ivan Shankle became the Commonwealth's chief witness at the trial. He acknowledged the plea agreement he entered into and indicated that in February, 1989 he had had surgery and needed money. Hockenberry, whom Ivan had known most of his life, offered to front him with drugs so he could make some money, (Transcript of Trial p. 262). The arrangement began with Shankle receiving approximately one (1) oz. of cocaine to sell. It quickly escalated to the point where he was buying up to one-quarter (1/4) lb. of cocaine and five (5) lbs. of marijuana per week, (Transcript of Trial p. 266). Over the course of the year, he indicated he "moved" on the average three (3) lbs. of marijuana and two (2) to three (3) ozs. of cocaine per week with (Transcript

of Trial p. 271). The drugs were given to Shankle on a front with the money being paid when the drugs were sold.

Shankle indicated that although the arrangement started between he and Hockenberry, within the first few transactions Shaffer became involved and he (Shankle) dealt thereafter with both individuals interchangeably, (Transcript of Trial pp. 271–272).

Shankle also testified he paid about $1100 or $1200 per pound of marijuana and made about $100 per pound in profit although he indicated his real money maker was cocaine. He stated he was paying $5500 for four (4) ozs. of cocaine, cut it by adding Vitamin B to make (5) ozs., and sold that for $1400 per ounce, ending up with a profit of $1500, (Transcript of Trial pp. 266–270). He indicated that he fronted his drugs to his customers in a manner similar to the manner in which Hockenberry and Shaffer fronted him.

Shankle testified that when he received the money from his drug sales, he paid either Hockenberry or Shaffer, whoever was there at the time, (Transcript of Trial p. 271). Shankle characterized his dealings as being with both Hockenberry and Shaffer. He indicated they were "like a team", (Transcript of Trial p. 272). Shankle testified that whenever he needed to obtain more drugs or had to deliver money, he drove to either Hockenberry's house or Shaffer's house [Hockenberry lived in a garage apartment at Shaffer's residence] or they would come to his house, whichever was most convenient. Although he admitted that most of his dealings were with Hockenberry, Shankle reiterated that he received cocaine and marijuana from both Hockenberry and Shaffer, and on more than one occasion paid one of the individuals for drugs which he received from the other, (Transcript of Trial pp. 272–276).

Shankle testified that during the first ten (10) months of their relationship, drugs were plentiful and always available from Hockenberry and Shaffer. Shortly after Christmas of 1989 their source of cocaine dried up and they ran out of supply. Shankle indicated that at that point both he and Hockenberry were looking for another source. He testified

to discussions with Hockenberry and Shaffer concerning money to purchase from other sources, (Transcript of Trial pp. 278–279). Through one of his customers Shankle learned of a source in Ohio. In January, 1990 he made a trip to the Ohio–West Virginia border area with $10,000 of funds supplied by Hockenberry, (Transcript of Trial pp. 279–281). He purchased a couple ounces of cocaine for approximately $3200 and give the cocaine and the change to Hockenberry, (Transcript of Trial p. 282). The cocaine so obtained was not the best quality and Shankle continued to hunt for another source. He learned of a New York supply through another of his customers. Shankle obtained $10,-000 from Hockenberry on March 1, 1990 at a spot near Dayton, Pennsylvania. Shaffer was present when the money was given to Shankle, (Transcript of Trial pp. 283–385). Shankle added $1000 of his own money and he, his customer and another individual, one Harry Farren, drove to Beacon, New York, met a contact and then drove into Manhattan where they purchased thirteen (13) ozs. of cocaine for $11,000, (Transcript of Trial p. 288). Upon returning to his home with the cocaine, Shankle added one (1) oz. of "cut" to make fourteen (14) ozs. and then took one (1) oz. of the diluted mixture off the top. He then gave Hockenberry the remaining thirteen (13) ozs. and Hockenberry gave back to Shankle one (1) oz. to split with the others for the trip to New York. Hockenberry then gave one-quarter (1/4) lb. to Shankle as a front so he (Ivan) could sell it. Hockenberry kept the eight (8) ozs. which were left, (Transcript of Trial pp. 288–289).

A few days later Shankle, Hockenberry and Shaffer discussed a second trip to New York to buy cocaine. This trip was for the purpose of securing a kilo of cocaine for $28,000. Shankle discussed with Shaffer the possibility of Shaffer riding along because of the amount of money being supplied. The trip was set for the 4th or 5th of March. Hockenberry delivered $28,000 to Shankle the morning of the second trip. Shaffer did not accompany the group because of other commitments. It was during this trip that the group de-

tected that they were being followed and aborted the trip, (Transcript of Trial pp. 289–294). The following day Neal and Rood confronted Shankle and confiscated the money. The agents then gave Shankle a fake search warrant with instructions to tell Hockenberry and Shaffer the van was searched and the money seized. Subsequently the money being seized was the subject of several discussions between Shankle, Hockenberry and Shaffer. They were trying to find a way to have the money returned. They also discussed the possibility of criminal charges being filed against Shankle (Transcript of Trial pp. 299–306). Shankle later retained a local attorney with funds supplied by himself and Hockenberry who paid one-half of the fee, (Transcript of Trial p. 307). Approximately one (1) year later, around March, 1991 Shankle agreed to cooperate with the government. Shankle indicated the drugs he purchased were stored either at Hockenberry's house or Shaffer's house and sometimes Hockenberry would have to go to Shaffer's house to get the drugs, (Transcript of Trial p. 324).

Alonzo Valenzuela and Jerry Garcia testified to delivering marijuana to Hockenberry and Shaffer from the State of Texas. Valenzuela was the driver who brought between 60 and 100 lbs. of marijuana once a month first to a person named Wise then to the Defendants, Hockenberry and Shaffer, (Transcript of Trial p. 378–382). The deliveries were made at a trailer in a rural section near New Bethlehem. Hockenberry was always accompanied by Shaffer, (Transcript of Trial p. 380). Valenzuela testified the drugs were packaged in one (1) lb. bags and were taken from his car into a trailer. Shaffer and another individual would count the bags, Valenzuela would be paid and would leave the area, (Transcript of Trial p. 383). Valenzuela testified that the price was $800 per pound so that he received $48,000 in cash for a 60 lb. delivery, (Transcript of Trial p. 384). Valenzuela testified he made six (6) to eight (8) trips to New Bethlehem with marijuana. Shaffer was with Hockenberry during each delivery, (Transcript of Trial p. 387). Valenzuela stated he saw Sherry Hockenberry twice—once

when she brought the money to the trailer where the marijuana was unloaded and once when his car broke down and he stayed at the Hockenberry residence, (Transcript of Trial, p. 387–388).

Jerry Garcia was the source of the marijuana delivered by Valenzuela to Hockenberry and Shaffer. He corroborated Valenzuela that he sent approximately 60 lbs. of marijuana six (6) or seven (7) times charging $800 per pound in each instance, (Transcript of Trial p. 414).

The testimony of the foregoing witnesses was corroborated by the intercepted phone conversations which were played for the jury. The contents of the conversations were frequently cryptic and the Shankles, Valenzuela and Garcia were called back to the stand and testified that the subject of the conversations concerned the purchase and delivery of drugs and/or money for the sale of drugs. In instances where one of the Commonwealth witnesses was not a party to the conversation an agent of the narcotics task force, qualified as an expert, gave his opinion on the meaning of terms used in the phone conversations.

Trial court opinion, 8/10/95, at 15–23 (footnote omitted). Based on this evidence, all three defendants were found guilty of all charges. Appellant filed extensive post-trial motions, which were denied. On October 31, 1995, he was sentenced from seven to ten years imprisonment. The Commonwealth invoked the mandatory minimum sentencing provision of 18 Pa.C.S. § 7508(a)(3)(iii), relating to cocaine.

The Commonwealth based application of that provision on the transaction which occurred on March 2, 1995. At trial, Mr. Shankle testified that he delivered twelve ounces of cocaine to appellant on that day and that appellant gave Mr. Shankle four ounces and kept eight ounces. An ounce of cocaine weighs 28.2 grams, which brought the weight of cocaine that appellant retained on March 2, 1995, to 225.6 grams. Then, the Commonwealth informed the court that appellant was a repeat offender in that in 1985, he pled guilty to delivery of a controlled substance and received a sentence of one to two years imprisonment.

Section 7508(a)(3)(iii) of title 18 provides that when a person is convicted of delivery of cocaine or possession with intent to deliver cocaine, he is subject to a mandatory minimum sentence of seven years imprisonment if the weight of the cocaine is at least 100 grams and if that person has been convicted of another drug trafficking offense. The sentencing court therefore applied that section to set appellant's minimum sentence. For the conviction of delivery of a controlled substance, a violation of 35 P.S. § 780–113, the court imposed a maximum sentence of ten years. This maximum sentence is set by section 780–113(f)(1.1). The court imposed concurrent sentences on the remaining charges. Thus, appellant's total sentence was seven to ten years imprisonment.

On August 14, 1996, appellant, *pro se*, filed a motion entitled, "Motion for Reduction/Modification of Sentence to Correct Illegal Sentence." In that motion, appellant contended that his sentence was illegal since the minimum sentence imposed exceeded one-half the maximum sentence. He asked that the court reduce his minimum sentence to five years imprisonment.[1] This appeal followed denial of that motion.

 Initially, we address two procedural issues. A motion to modify sentence must be filed within ten days of the imposition of the sentence, and an appeal from sentence must be filed within thirty days. Appellant was informed of these time limitations at the time of sentencing. N.T., 10/31/95, at 15. He filed the motion to modify his sentence over nine months after sentence was imposed. Normally, his sentencing claims would be waived. However, the issue on appeal relates to the legality of sentence. Issues relating to the legality of sentence cannot be waived and are cognizable under the PCRA. *Commonwealth v. Williams*, 442 Pa.Super. 590, 660 A.2d 614 (1995). Therefore, we will ignore the untimeliness of appellant's motion "to modify" his sentence and treat it as a PCRA petition relating to the legality of sentence.

 Next, there is an issue concerning the timeliness of this appeal as it relates to the August 22, 1996 order denying the

---

1. Appellant has not requested the appointment of counsel.

motion to modify the sentence. The notice of appeal from that order was not marked as received by the Prothonotary of Armstrong County until September 24, 1996. In response to a letter from this court's prothonotary, appellant indicated that he mailed the notice of appeal on September 19, 1996, by depositing it in the prison mail. With normal mail delivery allowances, his notice of appeal should have been received within three days, or on Monday, September, 23, 1996. His appeal would have been timely if received on Monday.

In *Smith v. Pennsylvania Board of Probation and Parole*, 546 Pa. 115, 683 A.2d 278 (1996), our Supreme Court held that a *pro se* prisoner's petition for review from the action of a parole board must be considered as filed for purposes of Pa.R.A.P. 1514(a) when the appeal is deposited with prison officials or placed in the prison mailbox. In that case, the defendant placed the petition for review in the prison mailbox within the thirty day period. He mailed the petition to the county prothonotary, who received it after the thirty day appeal period had expired and transferred it to this Court. We transferred it to the Commonwealth Court. The envelope indicating the postmark was not retained. The Commonwealth dismissed the appeal as untimely, and the Supreme Court reversed.

The Court first observed that the rules of appellate procedure are to be liberally construed to secure a just and inexpensive determination of every matter and that under the case law, dismissal of an appeal is warranted only in extreme cases. It then noted that Pa.R.A.P. 1514(a) expressly contains a mailbox rule and provides that if a petition is mailed, it will be considered filed when mailed.

The Court in *Smith* did not expressly construe Pa.R.A.P. 903, which is applicable herein. Indeed, while Pa.R.A.P. 1514 does contain a provision for mailing, Pa.R.A.P. 903 provides that an appeal to the Superior and Commonwealth Courts must be filed within thirty days and does not state that an appeal filed by mail will be considered filed when mailed.

Nonetheless, the holding in *Smith* is sweeping and applies the United States Supreme Court's pronouncement in *Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988), which states that under Fed.R.A.P. 4(a)(1), a *pro se* prisoner is deemed to file an appeal when it is given to prison authorities for mailing. Fed.R.A.P. 4(a)(1) is similar in language to Pa.R.A.P. 903 and provides that an appeal must be filed within thirty days. Fed.R.A.P. 4(a)(1), like Pa.R.A.P. 903, does not state that an appeal that is mailed will be considered filed when mailed.

Furthermore, our Supreme Court made the following broad ruling:

The *pro se* prisoner's state of incarceration prohibits him from directly filing an appeal with the appellate court and prohibits any monitoring of the filing process. Therefore, we now hold that in the interest of fairness, a *pro se* prisoner's appeal shall be deemed to be filed on the date that he delivers the appeal to prison authorities and/or places his notice of appeal in the institutional mailbox. We warn, however, that this holding applies only to *pro se* petitioners who are incarcerated.

*Smith v. Pennsylvania Bd. of Probation and Parole, supra,* 546 Pa. at ——, 683 A.2d at 281. Thus, the Court's holding is sweeping, clearly was not limited to an interpretation of Pa.R.A.P. 1514, and envisioned application to Pa.R.A.P. 903. We therefore consider appellant's appeal to be timely since his notice was placed in the prison mailbox within thirty days of entry of the order.

■ We now consider the merits of the issue raised. Appellant contends that his sentence is in violation of 42 Pa.C.S. § 9756(b), which provides that the court "shall impose a minimum sentence of confinement which shall not exceed one-half of the maximum sentence imposed." This statute was enacted in 1974. The statute imposing the minimum sentence herein, 18 Pa.C.S. § 7508, was enacted in 1988 and is a comprehensive statute relating to drug trafficking sentencing and penalties. It provides explicitly, "Notwithstanding any other provisions of this or any other act to the contrary, the

following provisions shall apply...." 18 Pa.C.S. § 7508(a). Thus, it is clear that the legislature intended the minimum sentences set forth in that section of the Pennsylvania Crimes Code to supercede the limits set forth in 42 Pa.C.S. § 9756(b) that a minimum sentence cannot exceed one-half a maximum sentence.

Our Supreme Court has come to this conclusion in *Commonwealth v. Bell,* 537 Pa. 558, 645 A.2d 211 (1994). In *Bell,* two defendants were subject to mandatory minimum sentences of five years imprisonment pursuant to 18 Pa.C.S. § 7508(a)(1)(iii), the same statute setting appellant's mandatory minimum sentence. The trial court refused to apply the mandatory minimum based on constitutional concerns and the fact that it limited the discretion of the judiciary in imposing sentence. The Commonwealth appealed.

The Supreme Court reversed. It concluded that the defendants' minimum sentences should have been set at five years, in accordance with section 7508(a)(1)(iii). It then concluded that the maximum sentences should have been set at five years under section 780–113(f)(2), which is the same statute the sentencing court applied herein to derive appellant's maximum sentence. Our Supreme Court then observed that the resulting sentence was inconsistent with 42 Pa.C.S. § 9756(b). The Court concluded that the prefatory language in section 7508 providing "Notwithstanding any other provision of this or any other act to the contrary" carved out an exception to section 9756(b). In this case, appellant was sentenced under section 7508. Therefore, under *Bell,* his sentence is an exception to section 9756, and his claim as to the legality of his sentence must fail.

Order affirmed.